**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EMILY SZABLA and SANDRA ELSOM-SCHROTH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIMBO BAKERIES USA, INC.,<br><br>Defendant. | **CIVIL CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Emily Szabla and Sandra Elsom-Schroth ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Bimbo Bakeries USA, Inc. ("Bimbo" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, and the investigation of their counsel and on information and belief as to all other allegations.

## NATURE OF THE ACTION

1. Defendant prominently advertises its premium bread products as free from artificial preservatives or flavors directly on the front of its products' labels, but sold and continues to sell various bread products under its Arnold, Brownberry, and Oroweat brands that include manufactured citric acid—an artificial preservative and flavor enhancer, including as to the following products[1] (the "Products"):

[1] Discovery may reveal other products by Defendant that contain artificial preservatives, unnatural ingredients and/or Glyphosate. Plaintiffs reserve their rights to amend and include such additional products in this action.

a. Brownberry: Whole Grains Health Nut; Whole Grains Healthy Multi-Grain; Whole Grains 100% Whole Wheat; Whole Grains 100% Whole Wheat, Small Slice; Whole Grains 12 Grains and Seeds; Whole Grains 22 Grains & Seeds, Small Slice; Whole Grains Oatnut; Whole Grains Oatnut, Small Slice; Country Style Sourdough; Country Style White; Country Style Buttermilk; and Organic 22 Whole Grains & Seeds.

b. Arnold: Whole Grains Health Nut; Whole Grains Healthy Multi-Grain; Whole Grains 100% Whole Wheat; Whole Grains 100% Whole Wheat, Small Slice; Whole Grains 12 Grains and Seeds; Whole Grains 22 Grains & Seeds, Small Slice; Whole Grains Oatnut; Whole Grains Oatnut, Small Slice; Country Style Sourdough; Country Style White; Country Style Buttermilk; and Organic 22 Whole Grains & Seeds.

c. Oroweat: Whole Grains Health Nut; Whole Grains Healthy Multi-Grain; Whole Grains 100% Whole Wheat; Whole Grains 100% Whole Wheat, Small Slice; Whole Grains 12 Grains and Seeds; Whole Grains 22 Grains & Seeds, Small Slice; Whole Grains Oatnut; Whole Grains Oatnut, Small Slice; Country Style Sourdough; Country Style White; Country Style Buttermilk; and Organic 22 Whole Grains & Seeds.

2. The citric acid that Defendant includes as an ingredient in the Products is "not natural citric acid; it is manufactured through fermentation using *Aspergillus niger*,"[2] a type of

[2] Iliana E. Sweis & Bryan C. Cressey, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, 5 TOXICOLOGY REPS. 808 (Aug. 9, 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6097542/.

black mold, and then extracted using chemical solvents, and, thus, is an artificial, synthetic preservative.

3. Further, Defendant advertises certain of the Products as created for "health nuts" who are interested in "heart healthy" breads.[3] But, these Products contain undisclosed Glyphosate, a toxic, synthetic pesticide that has been associated with negative cardiovascular effects.[4] Specifically, testing of Product samples, including one Product sample purchased by Plaintiff Elsom-Schroth, confirmed the presence of detectable levels of Glyphosate as follows:

| **Product** | **Glyphosate (ppb)** |
|---|---|
| Arnold Whole Grains Healthy Multi-Grain Bread[5] | 200 ppb |
| Brownberry Whole Grains Healthy Multi-Grain | 214 ppb |

4. Glyphosate is classified by many regulatory agencies as a carcinogen[6] and exposure to it is associated with renal cell carcinoma, neurotoxicity, oxidative stress, and childhood

[3] Institute for Exposomic Research at Mount Sinai Icahn School of Medicine, *Glyphosate and your health*, 12/13/2024, https://mountsinaiexposomics.org/glyphosate-and-your-health/. "Pesticide" is a broad term that includes any products used to prevent, destroy, or repel bugs, molds, or insecticides (herbicide). As used herein, "Glyphosate" refers to both glyphosate and glyphosate-based herbicides.

[4] Lucia Calderon et al., *Residential proximity to agricultural pesticide use and cardiovascular disease risk factors among adult Latina women in California's Salinas Valley*, 193(11) AM. J. EPIDEMIOLOGY 1583 (Nov. 2024), https://academic.oup.com/aje/article/193/11/1583/7693075.

[5] This testing represents results from product purchased by Plaintiff Elsom-Schroth.

[6] International Agency for Research on Cancer ("IARC"), *IARC Monograph on Glyphosate*, World Health Organization, Mar. 20, 2015, https://www.iarc.who.int/featured-news/media-centre-iarc-news-glyphosate/ (the IARC classified glyphosate as "probably carcinogenic to humans"); State of California Office of Environmental Health Hazard Assessment, *Glyphosate listed effective July 7, 2017, as Known to the State of California to Cause Cancer*, June 26, 2017, https://oehha.ca.gov/proposition-65/crnr/glyphosate-listed-effective-july-7-2017-known-state-california-cause-cancer (Glyphosate "was added to the list of chemicals known to the state to cause cancer for purposes of Proposition 65").

leukemia, and is associated with childhood brain tumors and overall cancer, brain, and other central nervous system cancers.[7]

5. A reasonable consumer would want to know that Products being advertised for "health nut[s]" and as "heart healthy," in fact, include a pesticide associated with negative health consequences, including negative cardiovascular effects.

6. Even without these misleading representations, exposure to any source of contaminants or pesticides should be avoided and minimized, and the disclosure of the presence of Glyphosate in products intended to be regularly consumed, is presumptively material. Given the documented health concerns, reasonable consumers expect a company to disclose if a product has detectable levels of Glyphosate.

7. Reasonable consumers, including Plaintiffs, trusted Defendant to sell its Products true to its representations, prominently displayed on the front of their packaging—that they contained no artificial preservatives or flavors and were "heart healthy." Because the Products contained manufactured citric acid and Glyphosate, this trust was violated.

8. Further, because of Defendant's misrepresentations, partial misrepresentations, and omissions, Plaintiffs reasonably did not expect the Products to contain artificial preservatives, artificial flavors, and/or detectable levels of Glyphosate.

9. The inclusion or real risk of artificial preservatives, unnatural ingredients, and/or Glyphosate contradict and impede the central function of the Products. The Products are meant to provide nutrients such as fiber and protein. None of the artificial preservatives, unnatural

[7] Simona Panzacchi et al., *Carcinogenic effects of long-term exposure from prenatal life to glyphosate and glyphosate-based herbicides in Sprague-Dawley rats*, 24:36 ENV'T HEALTH, June 10, 2025, https://link.springer.com/content/pdf/10.1186/s12940-025-01187-2.pdf.

ingredients, nor Glyphosate in Defendant's Products provide such benefits and instead pose health risks.

10. Based on the messaging and overall impression communicated by the Products' packaging, including the misrepresentations, partial misrepresentations, and omissions described herein, no reasonable consumer, including Plaintiffs, could expect or understand the Products contained or risked containing artificial preservatives, artificial flavors, and Glyphosate.

11. Reasonable consumers purchasing these products, including Plaintiffs, would consider it material that Defendant's bread products contained manufactured citric acid, rather than naturally derived citric acid, and detectable levels of Glyphosate.

12. Defendant intended for consumers to rely on its misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct regarding the Products' quality, ingredients, standards, and suitability for use or consumption. Defendant's business practices, including the misrepresentations, partial misrepresentations, and omissions regarding the presence of artificial preservatives, artificial flavors, and Glyphosate in the Products, were deceptive, misleading, unfair, and/or false because, among other things, the Products contained undisclosed manufactured citric acid and/or Glyphosate.

13. Defendant knows its customers, such as Plaintiffs and Class members, trust the quality of its products and expect the Products to not contain or risk containing artificial preservatives and flavors or Glyphosate.

14. Defendant also knows that certain consumers will seek out and wish to purchase bread products that do not have artificial preservatives or unnatural ingredients, such as manufactured citric acid, or detectable levels of Glyphosate, and that these consumers will pay more for products that they believe possess these qualities. Indeed, Defendant has intentionally

and knowingly positioned itself in the market as one of the top sustainable manufacturers of bread products, including the Products, with its parent, Grupo Bimbo, telling its investors it is focused on "transparent sustainable brands" providing the "best nutritional profiles for all" and upholding "environmental standards" with a focus on "food safety and quality" to enact its mission to "nourish[] a better world."[8] And, on July 6, 2026, Defendant committed to phase out the use of artificial preservatives and emulsifiers in several of its iconic brands by the end of 2028.[9]

15. Plaintiffs bring this class action against Defendant for unfair, misleading, and deceptive business practices, including the misrepresentations, partial misrepresentations, and omissions described herein, that violate consumer protection laws. Plaintiffs seek injunctive and monetary relief on behalf of the proposed Classes, including (i) requiring full disclosure that Defendant's Products contain manufactured citric acid or requiring Defendant to cease advertising or labeling the Products as free from artificial preservatives and flavors to the extent they include manufactured citric acid as an ingredient; (ii) requiring testing of all ingredients and final Products for Glyphosate; and (iii) restoring monies to the members of the proposed Classes. Through this action, Plaintiffs assert claims for violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/, the New York General Business Law §§ 349 and 350, fraud by omission, and unjust enrichment, seeking monetary damages, injunctive relief, and all other relief as authorized in equity or by law.

---

[8] Grupo Bimbo, Management Approach to the Sustainability Strategy at 1-2 (2025 Integrated Annual Report), https://d2rwhogv2mrkk6.cloudfront.net/2026-07/Descargable_Enfoque_de_gestion_Eng_VF%202905.pdf.

[9] Press Release, Bimbo Bakeries USA, Bimbo Bakeries USA Announces Weeping Portfolio Commitments to Advance Nutrition and Cleaner Label, July 2, 2026, https://bimbobakeriesusa.com/press/2026-07-02/bimbo-bakeries-usa-announces-sweeping-portfolio-commitments-to-advance-nutrition (Artesano, Oroweat breads and buns, and The Rustik Oven products by end of 2027, and Sara Lee, Little Bites, Oroweat specialty varieties, and Thomas' by the end of 2028).

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 Class Members are involved; and many members of the proposed Classes, including Plaintiffs, are citizens of different states than the Defendant.

17. This Court has personal jurisdiction over Defendant because Defendant committed the tortious acts alleged herein in this District, regularly conducts business in this District, and has extensive contacts with this forum.

18. Defendant purposefully availed itself of the Illinois market, and thus of the benefits of the laws of the State, during all times relevant to this Complaint, so as to render Illinois' courts' exercise of jurisdiction over Defendant consistent with traditional notions of fair play and substantial justice.

19. Defendant is transacting or has transacted substantial business in Illinois; has or does derive substantial revenue in Illinois or engages in a persistent course of conduct in Illinois; and has intentionally engaged in conduct aimed at Illinois residents, which has caused harm they knew was likely to be incurred in Illinois.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the actions and inactions giving rise to Plaintiffs' claims occurred in this District and because Defendant transacts substantial business in this District.

## THE PARTIES

### I. PLAINTIFFS

21. Plaintiff Emily Szabla is, and at times relevant hereto was, a citizen of the State of Illinois and a resident of Orland Park, Illinois. She has purchased the Products, including Brownberry Whole Grains Healthy Multi Grain Bread, for her personal use, from Jewel-Osco in

Orland Park, Illinois. She has bought this bread many times over approximately the past year and a half. Based on Defendant's representations, including on the Product packaging, Plaintiff Szabla believed she was purchasing and consuming a healthy and nutritious product free from artificial preservatives or unnatural ingredients.

22. Plaintiff Sandra Elsom-Schroth is, and at times relevant hereto was, a citizen of the State of New York and a resident of Fairport, New York. She has purchased the Products, including Arnold Whole Grains Healthy Multi-Grain Bread, for her personal use, from Wegmans in Webster, New York. She has bought Arnold bread many times per year for at least the past five years. Based on Defendant's representations, including on the Product packaging, Plaintiff Elsom-Schroth believed she was purchasing and consuming a healthy and nutritious product free from artificial preservatives or unnatural ingredients.

23. Prior to purchasing, Plaintiffs saw and relied upon the packaging of the Products, including but not limited to representations that the Products were "heart healthy," nutritious, and did not contain artificial preservatives or unnatural ingredients such as manufactured citric acid. During the time they purchased and used the Products, and based on the messaging and overall impression communicated by the packaging and due to the misrepresentations, partial misrepresentations, and omissions with regard to the Products by Defendant, they were unaware that the Products contained (or had a material risk of containing) artificial preservatives or flavors or Glyphosate and believed that they were purchasing and consuming a heart healthy and nutritious product. Plaintiffs would not have paid the price they did or purchased the Products if that information had been fully disclosed. Plaintiffs would consider purchasing the Products again in the future if they no longer contain artificial preservatives or unnatural ingredients and Glyphosate.

24. Plaintiffs were injured when they paid the purchase price or a price premium for the Products that did not deliver what was promised by Defendant. Plaintiffs paid the purchase price on the reasonable assumption that the Products' packaging and advertising was accurate, the Products did not contain or risk containing artificial preservatives or unnatural ingredients such as manufactured citric acid or Glyphosate, and were the heart healthy products Defendant advertised them to be. Plaintiffs would not have paid this money had they known the truth about the Products.

**II. DEFENDANT**

25. Defendant Bimbo Bakeries USA, Inc. is a Delaware company. Until April 2026, its corporate U.S. headquarters was located at 355 Business Center Drive, Horsham, Pennsylvania.

26. In April 2026, Defendant moved the headquarters of its U.S. operations to 5525 MacArthur Boulevard, Irving, Texas 75038.

27. Defendant is responsible for sourcing ingredients, manufacturing and distributing the Products, and conducting all relevant quality assurance protocols, including testing the ingredients and finished products.

28. Defendant knowingly created, oversaw and authorized the unlawful, fraudulent, unfair, misleading, and deceptive packaging and related marketing for the Products that falsely claimed to not contain artificial preservatives or unnatural ingredients when they in fact contained manufactured citric acid, and did not disclose the presence of detectable levels of Glyphosate.

## ADDITIONAL FACTUAL ALLEGATIONS

29. Each of Defendant's Products contains manufactured citric acid and serval contain detectable levels of Glyphosate, rendering its representations as to the Products and the overall impression of a healthful, nutritious product with no unnatural or artificial ingredients false, misleading, or materially incomplete.

## I. CITRIC ACID

30. Citric acid can be derived from certain citrus fruits, from which natural citric acid can be directly extracted.[10] The extraction of natural citric acid from citrus fruits is limited to certain small factories in Mexico and Africa, and naturally produced citric acid comprises only 1% of global citric acid production.[11]

31. Citric acid has several applications in a number of industries, including as an ingredient in food and beverages[12] used "to control acidity, add flavor [and] protect quality,"[13] and for other uses as depicted below:[14]

[10] *See* Gavin Van De Walle, *What Is Citric Acid? Benefits, Uses, Safety & Side Effects*, Healthline, updated Apr. 16, 2026, https://www.healthline.com/nutrition/citric-acid.

[11] Belén Max et al., *Biotechnological production of citric acid*, 41(4) Brazilian J. Microbiology, 862 (Dec. 1, 2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3769771/.

[12] 21 C.F.R. § 101.22(a)(5) ("The term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof . . . ."); *see also* Gavin Van De Walle, *supra* n.10; *see also* Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

[13] Smartlabel, Brownberry, Whole Grains, 100% Whole Wheat Small Slice Bread, Ingredients, Citric Acid, https://smartlabel-bbu.scanbuy.com/073410957295-0004-en-US/index.html#ingredients.

[14] Ambreen Latif et al., *An overview of key industrial product citric acid production by* Aspergillus niger *and its application*, 52 J. Industrial Microbiology & Biotechnology, at 2 (2025) https://pmc.ncbi.nlm.nih.gov/articles/PMC11956825/pdf/kuaf007.pdf.




**Fig. 7.** Applications of citric acid in different industries.

32. Natural citric acid is expensive to extract and the demand for it well exceeds supply. Accordingly, ninety-nine percent of citric acid sold worldwide is manufactured through artificial processes, including the citric acid[15] used in Defendant's food products at issue here.

## A. THE CITRIC ACID MANUFACTURING PROCESS

33. "Citric acid is a major industrial chemical[.]"[16] The chemical structure of citric acid ($C_6H_8O_7$) is shown below:[17]

---

[15] "Citric acid," as used herein, refers to manufactured citric acid.

[16] American Chemical Society, Molecule of the week archive, "citric acid," April 4, 2022, https://www.acs.org/molecule-of-the-week/archive/c/citric-acid.html.

[17] Ambreen Latif et al., *supra* n.19, at 2.




34. Manufactured citric acid used as a food additive is created "from fermentation of crude sugars []by the mold Aspergillus niger," commonly known as black mold.[18] "Aspergillus niger is considered as the main workhorse for large-scale production of citric acid."[19] Aspergillus Niger is a "potent allergen"[20] associated with "serious health risks," especially for those with asthma, allergies, and immune deficiencies.[21] The image below depicts *Aspergillus niger* in different growth durations:[22]

---

[18] American Chemical Society, *Molecule of the Week Archive: Citric acid*, Apr. 4, 2022, https://www.acs.org/molecule-of-the-week/archive/c/citric-acid.html; *see also* Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

[19] Ambreen Latif et al., *supra* n.19, at 2.

[20] Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

[21] AutoClave, Aspergillus Niger: Health Impacts and Solutions, https://aeroclave.com/what-is-aspergillus-niger-how-prevent-this-common-indoor-mold/?cn-reloaded=1.

[22] Sarah Peterson, U.S. Naval Research Laboratory, Image Gallery, https://www.nrl.navy.mil/News-Media/Images/igphoto/2003066168/.




35. Specifically, manufactured citric acid is the result of extensive chemical processing and is synthetically produced by combining cheap sugars, primarily highly processed glucose from corn syrup (also less commonly from beet sugar, molasses, or fruit waste) with the black mold, *Aspergillus niger*,[23] and fermenting it with other additives such as manganese, phosphate, and nitrogen or heavy metals.[24]

36. Once the sugars, black mold, and other necessary ingredients are combined in a proper medium, a chemical process called the Krebs cycle occurs.[25] The Krebs cycle is a series of eight reactions that take place in the mitochondrion of the *Aspergillus niger*, which, among other byproducts, produces citric acid:[26]

---

[23] Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

[24] P.L. Show et al., *Overview of citric acid Production from* Aspergillus niger, 8(2) FRONTIERS LIFE SCI. 271, 272 (2015), https://www.tandfonline.com/doi/epdf/10.1080/21553769.2015.1033653.

[25] *Id.* at 274.

[26] Ambreen Latif et al., *supra* n.19, at 2.




**Fig. 4.** Production of citric acid by *A. nige r* inside mitochondria.

37. This process results in the formation of a "fermentation broth" that includes the byproducts of the Krebs cycle and fermentation process, including citric acid. Once the citric acid is synthetically created through this process, it must be recovered and separated from the other byproducts of the fermentation and Krebs cycle. The recovery can be achieved in a number of ways, including crystallization, precipitation, extraction, and adsorption.[27]

38. Generally, crystallization involves removing solids remaining in the fermentation broth, saturating the fermentation solution until citric acid crystals begin to form. Once the crystals have fully grown, they are separated from what is known as the "mother liquor" using a centrifuge and then rinsed and dried to remove remaining moisture.[28]

[27] P.L. Show, *supra* n.29 at 279.

[28] Beijing MecKey Engineering Co., *Citric acid crystallization process: 6 Key Stages for Purity*, May 26, 2026, https://meckey.com/news/Citric-acid-crystallization-process-6-Key-Stages-for-Purity-en.html.

39. Precipitation is the most used method for citric acid extraction.

> [I]t requires the removal of the micelles from the fungus, fermentation broth and suspended material by filtration Calcium oxide hydrate (milk lime) is added to the medium and the lime is then precipitated into tricalcium citrate tetrahydrate. Then, the precipitate is filtered and washed with water. Thereafter, it is treated in an acidulator with calcium sulphate, a sulphuric-acid forming gypsum. Next, it is filtered and the mother liquor is treated with active carbon and passed through anion and cation exchangers. It is further concentrated by evaporation in a vacuum at 40°C. Lastly, crystals of citric acid monohydrate are formed in a vacuum crystallizer at a temperature of 20–25°C and anhydrous citric acid is formed at crystallization temperatures above 36.5°C.[29]

40. Solvent extraction is also used to isolate and separate citric acid from other byproducts using a mixture of n-octyl alcohol and tridodecylamine or other chemical compounds.[30] It is 50% more expensive than precipitation and is less frequently used.[31]

41. Adsorption uses solvents to cause citric acid molecules to gather on the surface of a liquid or solid, where it is then recovered and separated.[32]

42. No matter what process is used, the manufacture of citric acid, including the citric acid used in Defendant's products, is highly artificial and synthetic. It uses highly allergenic black mold fermentation to create citric acid through chemical processes. These manufacturing processes and resulting extraction of citric acid can result in a number of impurities posing potential health risks.

### B. NEGATIVE HEALTH EFFECTS OF CITRIC ACID

43. Because of the presence of contaminants in manufactured citric acid, including residual black mold, its consumption is associated with allergic reactions in allergen-sensitive

---

[29] P.L. Show, *supra* n.29 at 280.

[30] *Id.*; *see also* H.S. Grewal & K.L. Kalra, *Fungal Production of Citric Acid*, 13(2) BIOTECHNOLOGY ADVANCES 209, 223 (1995).

[31] P.L. Show, *supra* n.29 at 280-81.

[32] Ambreen Latif et al., *supra* n.19 at 11.

individuals.[33] Ingestion of manufactured citric acid may also "lead to increased inflammation, which in susceptible individuals affects the respiratory, gastrointestinal, neurological and musculoskeletal systems."[34]

44. One report showed that after ingesting manufactured citric acid, individuals experienced joint pain with swelling and stiffness, muscular pain, shortness of breath, abdominal cramping, and enervation.[35] None of the individuals experienced any of those symptoms after ingesting natural forms of citric acid.[36]

### C. DEFENDANT USES MANUFACTURED CITRIC ACID IN THE BREAD PRODUCTS

45. As noted supra, 99% of the world's citric acid is manufactured,[37] and the citric acid added by Defendant to its Products is no exception.

46. Food products, such as those at issue here, made and used by commercial producers, including Defendant, contain manufactured citric acid, where it acts as a preservative.[38]

47. There are no naturally derived citric acid suppliers in the United States with supply capable of supplying Defendant with citric acid for use in its products.

---

[33] *See* Gavin Van De Walle, *supra* n.10.

[34] Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

[35] *Id.*

[36] *Id.*

[37] *See id.*; *see also* R. Ciriminna et al., *Citric acid: Emerging applications of key biotechnology industrial product*, Chemistry Central Journal, Mar. 8, 2017, https://link.springer.com/article/10.1186/s13065-017-0251-y; E. Ksiazek, *Citric acid: Properties, microbial production, and applications in industries*, Molecules, Dec. 19, 2021, https://pmc.ncbi.nlm.nih.gov/articles/PMC10779990/#sec5-molecules-29-00022.

[38] *See. e.g.*, *SmartLabel for Orowheat Whole Grains Healthy Multi-Grain Bread*, June 18, 2025, https://smartlabel-bbu.scanbuy.com/073130003678-0005-en-US/index.html#ingredients (citric acid: "A tart-tasting ingredient used to control acidity, add flavor or protect quality in foods.").

48. Defendant's primary ingredient suppliers appear to be Archer Daniels Midland Co., headquartered in Illinois ("ADM"), and Cargill, Inc., headquartered in Minnesota ("Cargill"). Cargill and Bimbo prominently advertise their partnerships,[39] and in at least 2018, 2019, 2024, and 2025, Bimbo Grupa, Bimbo's parent company awarded its "suppliers of the year," which included ADM.[40]

49. Cargill and ADM are the world's largest food-grade artificial citric acid manufacturers.[41] Neither manufactures naturally derived citric acid.[42]

50. Upon information and belief either or both of Cargill or ADM supplies Defendant with the citric acid used in the Products during the relevant period.

---

[39] *See, e.g.*, Press Release, Cargill, Inc., Cargill works to positively impact communities where employees live and work, Aug. 10, 2020, https://www.cargill.com/2020/cargill-works-to-positively-impact-communities (describing a partnership with Bimbo to help corn farmers adopt sustainable agriculture practices).

[40] Press Release, Grupo Bimbo, Grupo Bimbo honors its business partners at the 2025 Global Vendors Meeting and Sustainability Summit, Nov. 19, 2025, https://www.grupobimbo.com/en/press/releases/business/grupo-bimbo-honors-its-business-partners-2025-global-vendors-meeting-and; Lucas Cuni-Mertz, *Grupo Bimbo awards top suppliers*, BAKING BUS., Jan. 28, 2025, https://www.bakingbusiness.com/articles/63139-grupo-bimbo-awards-top-suppliers; Press release, Grupo Bimbo, Grupo Bimbo recognizes the work and commitment of its strategic partners at 2018 Global Vendors Meeting, Nov. 13, 2018, https://www.grupobimbo.com/en/press/releases/productivity/grupo-bimbo-recognizes-work-and-commitment-its-strategic-partners-2018; Press Release, Bimbo Canada, Grupo Bimbo Recognizes Global Vendors for Their Commitment and Contribution to Business Objectives for the Company, Nov. 19, 2019, https://bimbocanada.com/press-release/grupo-bimbo-recognizes-global-vendors-their-commitment-and-contribution-business.

[41] IMARC Group, Top Players in the Citric Acid Market.

[42] *See* Cargill, Inc., Citric Acid, https://www.cargill.com/food-bev/na/citric-acid ("Citric acid occurs in citrus fruits like lemons, limes and oranges, and is produced commercially via fermentation."); ADM, Acidulants, Citric Acid and Citrates, https://www.adm.com/en-us/products-services/human-nutrition/products/acidulants/ ("The ADM portfolio of citric acid and other acidulants are manufactured in Southport, NC with the support of our farmer relationships and vast supply chain network.").

51. Because Defendant's import records for the period from October 21, 2012, through August 11, 2026, reflect that Defendant has not imported citric acid or the Products into the United States since at least as far back as October 21, 2012, and no U.S.-based manufacturer produces naturally derived citric acid, Defendant's Bread Products, sold in the United States, necessarily contain manufactured, artificial citric acid.

### D. DEFENDANT'S MISREPRESENTATIONS ABOUT ITS INCLUSION OF MANUFACTURED CITRIC ACID IN ITS BREAD PRODUCTS.

52. Citric acid is a "preservative," as defined by FDA regulations[43] and Defendant's own descriptions of the ingredient,[44] and as set forth *supra*, the citric acid used by Defendant in its Products is an *artificial* preservative.

53. Nonetheless, Defendant falsely and prominently advertises the Products as:

a. "Free from artificial preservatives, colors, or flavors;" "free from artificial preservatives;" "no artificial preservatives;" "no artificial colors or flavors"; and




---

[43] 21 C.F.R. § 101.22(a)(5).

[44] Smartlabel, *supra* n.18.

b. As made or baked with “real ingredients.”




54. These misrepresentations and false statements appear directly on the front of the product packaging, often with “free from artificial preservatives” or “flavors” being prominently emphasized:

a. Brownberry Whole Grains Health Nut;






b. Brownberry Whole Grains Healthy Multi-Grain;[45]







[45] The second image for Brownberry Whole Grains Healthy Multi-Grain at paragraph 54(b) that shows the side of the packaging was obtained from the product's point-of-sale webpage on Amazon.com at https://www.amazon.com/Brownberry-Healthy-Artificial-Flavors-Preservatives/dp/B00061ESSS/ref=sr_1_1_us_f3_0o_fs, which includes an image of an Arnold bread product (despite the product listing being for Brownberry).

c. Brownberry Whole Grains 100% Whole Wheat;







d. Brownberry Whole Grains 100% Whole Wheat, Small Slice;






e. Brownberry Whole Grains 12 Grains and Seeds;







f. Brownberry Whole Grains 22 Grains & Seeds, Small Slice;






g. Brownberry Whole Grains Oatnut;







h. Brownberry Whole Grains Oatnut, Small Slice;






i. Brownberry Country Style Sourdough;






j. Brownberry Country Style White;









k. Brownberry Country Style Buttermilk;







l. Brownberry Organic 22 Whole Grains & Seeds.






m. Arnold Whole Grains Health Nut;







n. Arnold Whole Grains Healthy Multi-Grain;






o. Arnold Whole Grains 100% Whole Wheat;







p. Arnold Whole Grains 100% Whole Wheat, Small Slice;






q. Arnold Whole Grains 12 Grains and Seeds;







r. Arnold 22 Grains & Seeds, Small Slice;






s. Arnold Whole Grains Oatnut;







t. Arnold Whole Grains Oatnut, Small Slice;






u. Arnold Country Style Sourdough;







v. Arnold Country Style White;






w. Arnold Country Style Buttermilk;










x. Arnold Organic 22 Whole Grains & Seeds;






y. Orowheat Whole Grains Health Nut;







z. Orowheat Whole Grains Healthy Multi-Grain;






aa. Orowheat Whole Grains 100% Whole Wheat;







bb. Orowheat Whole Grains 100% Whole Wheat, Small Slice;









cc. Orowheat Whole Grains 12 Grains and Seeds;







dd. Orowheat 22 Grains & Seeds, Small Slice;






ee. Orowheat Whole Grains Oatnut;







ff. Orowheat Whole Grains Oatnut, Small Slice;






gg. Orowheat Country Style Sourdough;









hh. Orowheat Country Style White;






ii. Orowheat Country Style Buttermilk; and







jj. Orowheat Organic 22 Whole Grains & Seeds;






55. These representations that the Products are, e.g., "FREE FROM ARTIFICIAL PRESERVATIVES" are false or, at best, misleading given the presence of artificial preservative and flavor enhancer citric acid in the Products.

56. Defendant's disclosure of citric acid as an ingredient does not cure their misrepresentations, and, if anything, renders its representations more misleading. Because natural citric acid does exist, and Defendant represented that its Products were "free from artificial preservatives and flavors," a reasonable consumer reading the label would understand the citric acid in the Products' ingredient lists to be naturally derived, not manufactured. And, Defendant's failure to identify citric acid as a preservative in its ingredient list, much less a manufactured or artificial ingredient, compounded the confusion and further concealed the truth.

## II. GLYPHOSATE

57. Testing of samples of Defendant's Products, including a sample of a Product purchased by Plaintiff Elsom-Schroth, reveals that at least several of Defendant's Products also contain undisclosed Glyphosate:

| **Product** | **Glyphosate (ppb)** |
|---|---|
| Arnold Whole Grains Healthy Multi-Grain Bread[46] | 200 ppb |
| Brownberry Whole Grains Healthy Multi-Grain | 214 ppb |

58. Glyphosate was first patented as an herbicide in 1971 and introduced in 1974 as a pesticide under the brand name "Roundup."[47]

---

[46] This testing represents results from product purchased by Plaintiff Elsom-Schroth.

[47] Heartland Health Research Alliance, Managing Weeds for Healthy Kids, The Low Down on Roundup, Part I: Glyphosate Discovery and Commercialization, *at* https://hh-ra.org/wp-content/uploads/2017/07/The-Low-Down-on-Roundup-Part-I-FINAL.pdf.

59. Glyphosate is used a pre-emergent herbicide for conventional crops and as an over-the-top herbicide with genetically modified glyphosate-resistant crops.[48] It is also widely used as a desiccant, used just before harvest to kill foliage and accelerate plant dry-down, mostly for grains and legumes.[49]

60. Glyphosate can accumulate in treated crops and in soil and water, causing a diffuse contamination in plant-based food products.[50] Additionally, because Glyphosate is used an herbicide and as a crop-drying agent for cereal harvesting, crops are treated repeatedly with Glyphosate during each season.[51]

61. In 2015, the IARC published the monograph for glyphosate, where it was classified as a Group 2A herbicide and "probably carcinogenic to humans," based on "'limited' evidence of cancer in humans (from real-world exposures that actually occurred) and 'sufficient' evidence of cancer in experimental animals (from studies of 'pure' glyphosate)."[52]

---

[48] John Fagan et al., *Organic diet intervention significantly reduces urinary glyphosate levels in U.S. children and adults*, 189 ENV'T RES. 109898 (Oct. 2020), https://doi.org/10.1016/j.envres.2020.109898 (internal citation omitted).

[49] *Id.*

[50] Flavia Silvia Galli et al., *Overview of human health effects related to glyphosate exposure*, 6 FRONTIERS IN TOXICOLOGY, Sept. 17, 2024, https://doi.org/10.3389/ftox.2024.1474792.

[51] *Id.*

[52] IARC, *IARC monograph on glyphosate*, Mar. 20, 2015, https://www.iarc.who.int/featured-news/media-centre-iarc-news-glyphosate/; IARC, *Some Organophosphate Insecticides and Herbicides*: *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 112 (2017), https://publications.iarc.who.int/549.

62. In 2017, based on the IARC's identification of Glyphosate as causing cancer, the State of California added it to the list of chemicals known to cause cancer for the purposes of Proposition 65.[53]

63. Glyphosate can enter human bodies through various exposure routes, including dermal absorption, inhalation, ingestion, and consumption of glyphosate-contaminated food products.[54] While occupational exposures to Glyphosate are usually the highest, the main route of exposure for most people is through contaminated food.[55]

### A. NEGATIVE HEALTH EFFECTS OF GLYPHOSATE

64. In as early as 2001, glyphosate exposure was linked to non-Hodgkin lymphoma, a cancer of the blood.[56] Since then, additional studies have linked Glyphosate to lymphoma, with a "meta-analysis of human epidemiological studies suggests a compelling link between exposures to GBHs [glyphosate-based herbicides] and increased risk for NHL [non-Hodgkin lymphoma]."[57]

---

[53] State of California Office of Environmental Health Hazard Assessment ("OEHHA"), *Glyphosate listed effective July 7, 2017, as known to the state of California to cause cancer*, June 26, 2017, https://oehha.ca.gov/proposition-65/crnr/glyphosate-listed-effective-july-7-2017-known-state-california-cause-cancer; Letter from California's OEHHA to Monsanto Co., June 26, 2017, https://oehha.ca.gov/sites/default/files/media/downloads/proposition-65/crnr/comments/letterphilipmillerandiarcrespondstoreuters.pdf (Monsanto asked California to reconsider adding Glyphosate to the list of chemicals known to cause cancer, which the State declined because Monsanto did not meet the required threshold for reconsideration).

[54] Flavia Silvia Galli et al., *supra* n.59.

[55] Institute for Exposomic Research, *supra* n.3.

[56] H. H. McDuffie et al., *Non-Hodkgin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health*, 10(11) CANCER EPIDEMIOLOGY, BIOMARKERS, & PREVENTION 1155 (Nov. 2001), https://pubmed.ncbi.nlm.nih.gov/11700263/.

[57] Luoping Zhang et al., *Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence*, 781 MUTATION RES.: REVIEWS IN MUTATION RES. 186 (July-Sept. 2019), https://pubmed.ncbi.nlm.nih.gov/31342895/.

65. The adverse health risks associated with exposure to Glyphosate continue to be studied and analyzed. The effects of Glyphosate in humans have shown to pose significant and adverse health risks and consequences, including cause renal cell carcinoma, neurotoxicity, oxidative stress, and childhood leukemia, and is associated with childhood brain tumors and overall cancer, brain, and other central nervous system cancers.[58]

66. Pesticides such as Glyphosate are considered Endocrine Disrupting Chemicals—meaning they interfere with hormones in the body, the development of the brain and function of the nervous and reproductive organ systems.[59] Pesticides can also cause elevated rates of birth defects, nervous system toxicity, and antibiotic resistance.[60]

67. The strongest epidemiological evidence links Glyphosate exposure to non-Hodgkin lymphoma.[61]

[58] Simona Panzacchi et al., *supra* n.7.

[59] Institute for Exposomic Research, *supra* n.3.

[60] *Id.*

[61] Department of Environmental & Occupational Health Sciences at University of Washington's School of Public Health ("DEOHS"), Seattle statement on glyphosate and public health, Ma. 26, 2026, https://deohs.washington.edu/seattle-statement-glyphosate-and-public-health.




*The main exposure and contamination routes of glyphosate's and glyphosate-based herbicide's (GBHs) in humans.*[62]

68. Moreover, children, infants, and fetuses are the most vulnerable to pesticide exposure because of their developing organ systems and how they metabolize toxins.[63] Further, "[i]t is well-established that children are more vulnerable to pesticide exposure than adults."[64]

69. In announcing Florida's results from Glyphosate testing of commercial bread products, Florida's Surgeon General, Dr. Joseph Ladapo, stated, "Chronic exposure to glyphosate is linked to harmful gut microbiome changes, liver inflammation, and adverse neurologic effects.

---

[62] Galli, F. S., et al., *Overview of human health effects related to glyphosate exposure*, Frontiers in Toxicology, Sept. 17, 2024, https://doi.org/10.3389/ftox.2024.1474792.

[63] Institute for Exposomic Research at Mount Sinai Icahn School of Medicine, *Glyphosate and your health*, 12/13/2024, https://mountsinaiexposomics.org/glyphosate-and-your-health/; DEOHS, *supra* n.71.

[64] John Fagan, *supra* n.57 (internal citation omitted); *see also id*. (the study found that "urine glyphosate and AMPA levels were substantially higher in children than in their parents.").

Florida is taking action through transparency, continued testing, and a clear focus on reducing exposure to protect families."[65]

70. Additionally, studies conducted on animals have also shown numerous adverse health effects linked to Glyphosate, including benign and malignant tumors in blood, skin, liver, thyroid, nervous system, ovary, mammary gland, adrenal glands, kidney, urinary bladder, bone, endocrine pancreas, uterus, and spleen (hemangiosarcoma), circulatory system; endocrine and reproductive toxicity; cerebellar development; bone tumors; and can affect the peripheral and central nervous system.[66]

71. A 2025 study where Glyphosate was administered through drinking water to rats at three different doses found "significantly elevated" rates of leukemia-related incidences across all three dose-levels.[67] The study also found that "[d]ose-related increased incidences of leukemia, and of skin, liver, thyroid, nervous system tumors, compared to concomitant control or historical controls, were observed across all three treatment groups, indicating that *glyphosate was sufficient to drive the carcinogenic effects observed in all groups*."[68]

---

[65] Executive Office of the Governor Ron DeSantis, *Florida releases bread testing results under Healthy Florida First initiative*, Feb. 5, 2026, https://www.flgov.com/eog/news/press/2026/florida-releases-bread-testing-results-under-healthy-florida-first-initiative.

[66] Simona Panzacchi et al., *supra* n.7.

[67] *Id.*

[68] *Id.* (emphasis added).

72. Studies have also shown that Glyphosate exposure can infiltrate brain tissue and can result in "long-lasting pathological consequences," significant brain inflammation, and premature death.[69]

73. Evidence of the harmful effects of Glyphosate on humans at levels currently used is "so strong that no additional delays in regulation of glyphosate can be justified."[70]

74. Scientific literature also reveals an association between glyphosate exposure and the development of cardiovascular disease. A 2024 study published in the *American Journal of Epidemiology* examined residential proximity to agricultural pesticide use and cardiovascular disease risk factors among adult Latina women in California's Salinas Valley. The study concluded that "glyphosate pesticides may be associated with cardiovascular disease development in women with chronic environmental exposure."[71]

75. A January 2025 study similarly found that increased glyphosate exposure is associated with an increased risk of atherosclerotic cardiovascular disease ("ASCVD"). The study

[69] Joanna K. Winstone et al., *Glyphosate infiltrates the brain and increases pro-inflammatory cytokine TNFα: Implications for neurodegenerative disorders*, 19(193) J. NEUROINFLAMMATION (July 28, 2022), https://link.springer.com/article/10.1186/s12974-022-02544-5; Samantha K. Bartholomew et al., *Glyphosate exposure exacerbates neuroinflammation and Alzheimer's disease-like pathology despite a 6-month recovery period in mice*, 21(316) J. NEUROINFLAMMATION (Dec. 4, 2024), https://link.springer.com/article/10.1186/s12974-024-03290-6.

[70] DEOHS, *supra* n.71.

[71] Lucia Calderon et al., *Residential Proximity to Agricultural Pesticide Use and Cardiovascular Disease Risk Factors Among Adult Latina Women in California's Salinas Valley*, 193 AM. J. EPIDEMIOL. 1583 (2024), https://academic.oup.com/aje/article/193/11/1583/7693075.

found that glyphosate exposure "is associated with a higher risk of angina, coronary heart disease, and heart attack."[72]

76. Additional research has identified glyphosate exposure as a potential cause of adverse cardiac electrophysiological effects, including "diffuse electrophysiological depolarization and repolarization conduction abnormalities, including prolonged QTc, intraventricular block, and AV conduction delay"[73] which are abnormalities that "can lead to the development of life-threatening arrhythmias." A "growing number of clinical studies" have identified glyphosate exposure as a cause of chronic health problems, including heart disease.

77. Most recently, a January 2026 article in *Internal and Emergency Medicine* confirmed that detection of glyphosate in humans "has been associated with all-cause mortality, increased frailty, insulin resistance, impaired glucose homeostasis and diabetes, increased risk of atherosclerotic cardiovascular diseases, fatty liver, and chronic obstructive pulmonary disease."[74]

78. Scientific evidence supports that glyphosate exposure is associated with cardiovascular disease, including atherosclerotic cardiovascular disease, coronary heart disease, angina, myocardial infarction, and life-threatening cardiac arrhythmias.

79. Defendant's "Heart Healthy" representation on the label, reinforced by the accompanying heart symbol, is false, deceptive, and misleading because it affirmatively represents that the Products are beneficial to cardiovascular health while omitting that the Products contain a

---

[72] Wei Xu et al., *BMI-Mediated Association Between Glyphosate Exposure and Increased Risk of Atherosclerotic Heart Disease: A Large-Scale Cross-Sectional Study*, 20 PLoS ONE e0317908 (2025), https://pubmed.ncbi.nlm.nih.gov/39854502/.

[73] Next Generation Chiropractic, *Glyphosate Linked to Cardiovascular Disease*, Mar. 4, 2024, https://www.nextgenchiropractic.net/glyphosate-linked-to-cardiovascular-disease/.

[74] Agostino Di Ciaula et al., *Why Internists Should Be Concerned About Glyphosate*, 21 INTERN. & EMERG. MED. 15 (2026), https://pubmed.ncbi.nlm.nih.gov/40883631/.

substance scientifically associated with increased cardiovascular disease risk. A product containing Glyphosate cannot reasonably be marketed as "Heart Healthy" without disclosing this material fact.

80. Defendant's "Heart Healthy" label and heart symbol are material to reasonable consumers' purchasing decisions. Consumers, including Plaintiffs, reasonably understand cardiovascular health claims and symbols of this kind to mean that a product supports heart health and does not contain ingredients associated with harm to the cardiovascular system.

### B. DEFENDANT'S MISREPRESENTATIONS, PARTIAL MISREPRESENTATIONS, AND OMISSIONS REGARDING GLYPHOSATE

81. The Products' packaging communications misled and deceived reasonable consumers because Defendant omitted that the Products contained or had a material risk of containing Glyphosate, while representing the Products' benefits to health.

82. Specifically, Defendant's representations and misleading partial disclosures giving consumer the impression that their Products are healthy, free from unnatural ingredients, "heart healthy," or for "health nut[s]" are also materially misleading and incomplete in light of the presence of Glyphosate in the Products.

83. In addition to the overall impression of a healthful, nutritious product with no unnatural or artificial ingredients, as described in section I.D. *supra*, the Products' packaging includes several representations that are misleading in light of the Product's inclusion of detectable levels of Glyphosate, including but not limited to:

a. "Health Nut,"






b. “Heart Healthy”










c. “Good nutrition for a balanced life”






84. The undisclosed presence of detectable levels of Glyphosate in the Products renders these statements materially incomplete and misleading.

## III. DEFENDANT’S PRODUCTS CAN BE MANUFACTURED IN CONFORMANCE WITH ITS REPRESENTATIONS TO CONSUMERS

85. Based on Defendant’s misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, omissions, and overall impression given by the packaging, no reasonable consumer could expect or understand the Products contained or had a material risk of containing Glyphosate. This is particularly true given the availability of similar bread products, including others manufactured by Defendants, that are free from artificial preservatives and Glyphosate.

86. Defendant could have manufactured the Products without artificial preservatives or unnatural ingredients like manufactured citric acid. Indeed, Grupo Bimbo has committed to do so

as to several of its brands by 2028 (including Oroweat), and other Grupo Bimbo bread products, such as its Iberian 100% Natural line and its Baker's Loaf brand sold in India do not contain any artificial preservatives.[75] Other bread manufacturers also make bread products without the use of artificial preservatives.[76]

87. Defendant also could have manufactured its Products to be free of Glyphosate, or at the very least, to contain non-detectable levels of the same, as demonstrated by testing conducted by the State of Florida, which had a sensitivity as low as 10 ppb.[77]

88. Two bread products that were tested by the State of Florida were found to have no detectable Glyphosate: Sara Lee Artesano White (another Defendant-manufactured product) and Pepperidge Farm Farmhouse Hearty White.[78]

## IV. DEFENDANT'S MISREPRESENTATIONS, PARTIAL MISREPRESENTATIONS, AND OMISSIONS WERE MATERIAL TO CONSUMERS

89. Whether the Products contain artificial preservatives or unnatural ingredients or Glyphosate like manufactured citric acid is material information to reasonable consumers, including Plaintiffs.

90. The inclusion or real risk of inclusion of artificial preservatives or unnatural ingredients and Glyphosate in the Products contradict and impede the central function of the Products. The Products are meant to provide nutrients such as fiber and protein. Glyphosate and

---

[75] 2025 Integrated Annual Report, *supra* n.8 at 9, 34, 51.

[76] *See, e.g.*, Dave's Killer Bread 21 Whole Grains and Seeds, https://www.wholefoodsmarket.com/grocery/product/B001F79MMY (ingredient list).

[77] *See* Healthy Florida First, *Exposing Bread Toxins*, https://exposingfoodtoxins.com/bread/.

[78] *Id.*

artificial preservatives or unnatural ingredients provide no such benefits but instead pose health risks.

91. Based on the misrepresentations, partial misrepresentations, and omissions, and other deceptive conduct, described herein, reasonable consumers, including Plaintiffs, would not expect artificial preservatives or unnatural ingredients like manufactured citric acid or Glyphosate to be present in the Products.

92. Further, reasonable consumers would not be able to detect that the citric acid used in the Products was manufactured, nor could a reasonable consumer detect the presence of Glyphosate in the Products without conducting their own scientific tests or reviewing scientific testing.

93. Accordingly, reasonable consumers must and do rely on Defendant to honestly report what its Products contain.

94. Plaintiffs relied on the Products' packaging, including the misrepresentations, partial misrepresentations, and omissions contained therein when making their purchasing decisions.

95. Defendant knows that its consumers care about the presence of artificial preservatives in their Products. In its 2025 Integrated Annual Report, Grupo Bimbo told investors that:

> [W]e have laid the groundwork for eliminating artificial emulsifiers and preservatives to meet our 2027 goal. We innovated to respond to consumers who are increasingly conscious of the types of products they include in their diets, without compromising quality, safety, or taste.[79]

---

[79] 2025 Integrated Annual Report, *supra* n.8 at 35.

96. A recent survey conducted by PricewaterhouseCoopers supports the importance that consumers place on the presence of pesticides such as Glyphosate and preservatives such as citric acid in food:

a. 89% of consumers are concerned about the use of pesticides in their food, and

b. 89% of consumers are concerned about the levels of additives or preservatives in their food.[80]




[80] PwC, *PwC's Voice of the Consumer 2025: A new recipe for the food industry*, June 10, 2025, https://www.pwc.com/gx/en/issues/c-suite-insights/pwc-voice-of-the-consumer-survey-2025.pdf.

97. A report from earlier this year showed that the majority of U.S. adults, 95%, are concerned about chemicals in their food.[81]




[81] *See* Pew, *Americans are concerned about harmful chemicals in food, water and everyday products*, Feb. 26, 2026, https://www.pew.org/en/research-and-analysis/articles/2026/02/26/americans-are-concerned-about-harmful-chemicals-in-food-water-and-everyday-products (49% are "very" concerned, 29% are "somewhat", and 18% are "a little" concerned); *see also* S. Rahman et al., *Assessing consumers' understanding of the term "Natural" on food labeling*, Journal of Food Science, June 2020, https://pubmed.ncbi.nlm.nih.gov/32449960/ (survey showed consumers' top three food choices were products bearing the descriptive labels "Organic," "Made with real grains,." and "No preservatives.").

98. Most of U.S. adults, 83%, also "want companies to tell them more about the chemicals in their products."[82]

## V. DEFENDANT'S CONDUCT WAS DECEPTIVE

99. The misrepresentations, partial misrepresentations, and omissions described herein misleadingly convey to consumers that the Products are of a high quality and have certain characteristics they do not actually possess.

100. Defendant misleadingly causes consumers to believe its Products do not contain (or have a material risk of containing) artificial preservatives or unnatural ingredients like manufactured citric acid or Glyphosate, due to the material misrepresentations, partial misrepresentations, and omissions described herein, when in fact the Products do contain (or have a material risk of containing) Glyphosate and artificial preservatives or unnatural ingredients.

101. "The average consumer is under the impression that the added citric acid listed in the ingredients of prepared foods [like the Products] is derived from natural sources such as lemons and limes. However, the ingredient list is quite misleading since the added citric acid is not procured through natural sources."[83]

102. Therefore, Defendant's representation that its Products contained no artificial preservatives, coupled with the fact that the citric acid in the Products was a manufactured, chemical, synthetic, and unnatural ingredient, was deceptive to consumers like Plaintiffs and the Class Members.

103. Due to the overall impression of the packaging, misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions,

---

[82] Pew, *supra* n.91.

[83] *See* Iliana E. Sweis & Bryan C. Cressey, *supra* n.2.

particularly in conjunction with Defendant's representations that the Products are "heart healthy," provided "good nutrition," were "free from artificial preservatives," and made with "real ingredients," reasonable consumers, like Plaintiffs, would not suspect the presence of artificial preservatives, unnatural ingredients or Glyphosate in the Products.

104. Reasonable consumers, unlike Defendant, are not able to independently detect the presence of Glyphosate in the Products and are generally without the means to conduct their own scientific tests on the Products.

105. Similarly, reasonable consumers, such as Plaintiffs, are without the means to independently determine whether the citric acid used by Defendant and contained in the Products is manufactured.

106. Moreover, information regarding the presence of Glyphosate in the Products is in the exclusive possession of Defendant and not available to consumers. Defendant chose to not disclose such information to consumers and thus actively concealed the presence and risk of Glyphosate in the Products.

107. Reasonable consumers must and do rely on Defendant to honestly report what its Products contain.

108. Based on the failure to disclose the presence (or material risk) of manufactured citric acid or Glyphosate on the Products' packaging, no reasonable consumer would expect, suspect, or understand that the Products contained or had a material risk of containing manufactured citric acid and Glyphosate.

## VI. DEFENDANT HAS ACTIVELY CONCEALED THE TRUTH ABOUT THE PRODUCTS FROM CONSUMERS

109. Defendant actively and knowingly concealed from and failed to disclose to consumers, including Plaintiffs and the Classes, that the Products contain or materially risk containing artificial preservatives or unnatural ingredients and Glyphosate.

110. Defendant actively and knowingly concealed and failed to disclose material facts to Plaintiffs and other consumers about the negative health effects of the Products.

111. Defendant also knew of the formulations and ingredients of the Products yet failed to disclose the presence or material risk of artificial preservatives, unnatural ingredients or Glyphosate in the Products.

112. For example, despite Defendant's claims that the products are "free from artificial preservatives" and made with "real ingredients," Defendant knowingly includes manufactured citric acid, an artificial preservative, and unnatural ingredient.

113. Defendant knowingly and actively concealed the material facts from consumers because it knew consumers cared about the Products' quality, ingredients, standards, and suitability for use, and if consumers were to learn the truth about Defendant's claims, it would negatively affect Defendant's finances.

114. Defendant knew or should have known of the negative health effects associated with exposure to Glyphosate and artificial preservatives or unnatural ingredients, yet knowingly and actively concealed the use of artificial preservatives or unnatural ingredients like manufactured citric acid and presence or material risk of Glyphosate in the Products.

115. The knowing and active concealment of these material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, reasonable

consumers, including Plaintiffs and the Classes, believe the Products to be of a certain quality and suitable for use when they are not.

116. Plaintiffs and the Class Members made purchases they would not have made or paid a premium price for the Products had they known the truth based on Defendant's active concealment, omissions, misrepresentations, and partial representations regarding the presence or material risk of Glyphosate and use of artificial preservatives or unnatural ingredients in the Products.

117. Defendant charged, and Plaintiffs purchased the Products, paying a premium price for the Products despite the availability of comparable, lesser-priced bread products, also containing artificial preservatives, but, unlike Defendant, were truthful and did not advertise they were free from artificial preservatives or flavors, from other manufacturers.

| **Product at Issue** | **Price/ Ounce** | **Competitor Product** | **Price/ Ounce** |
|---|---|---|---|
| Brownberry Whole Grains Health Nut | $0.14 | Amazon Grocery, Round Top Wheat Bread | $0.08 |
| Arnold Whole Grains Health Nut | $0.15 | Amazon Grocery Multigrain Bread | $0.12 |
| Brownberry Whole Grains Healthy Multi-Grain | $0.21 | 365 by Whole Foods Market Organic Whole Wheat Bread | $0.16 |
| Arnold Whole Grains Healthy Multi-Grain | $0.22 | Pepperidge Farm Whole Grain Honey Wheat Bread | $0.17 |
| Brownberry Organic 22 Whole Grains & Seeds | $0.22 | Country Hearth Dakota Style 12 Grain Bread | $0.17 |
| Arnold Organic 22 Whole Grains & Seeds | $0.24 | Pepperidge Farm Whole Grain 15 Grain Bread | $0.17 |
| | | Pepperidge Farm Farmhouse Hearty White Bread | $0.17 |
| | | Sara Lee Artesano White Bread | $0.19 |

118. The facts concealed, omitted, or not disclosed by Defendant were material such that reasonable consumers, including Plaintiffs and the Classes, would have considered them when deciding whether to purchase the Products. Had Plaintiffs known the truth, they would not have purchased the Products or paid the premium price.

119. In light of Defendant's statements regarding the quality of the Products, including its supposed comprehensive quality controls, Defendant knew or should have known the Products contained or had a material risk of containing Glyphosate.

120. Defendant knew that properly and sufficiently monitoring the Products for Glyphosate was not only important, but critical.

121. Defendant knew or should have known it could control the presence of Glyphosate in the Products by requiring proper monitoring and testing for Glyphosate, at manufacturing and packaging stages, and effecting changes when needed.

122. Defendant also misleadingly claimed the Products do not contain artificial preservatives or unnatural ingredients when they in fact contained manufactured citric acid.

123. Based on Defendant's representations that the Products were "free from artificial preservatives" and made with "real ingredients," no reasonable consumer would expect, suspect, or understand that the Products contained manufactured citric acid.

124. Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive packaging based on the material misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions.

125. The misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions, are material and reasonably likely

to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions. This is especially true considering Defendant's long-standing campaign built on trust.

126. The misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions, make the Products' packaging deceptive based on the presence or risk of Glyphosate and artificial preservatives or unnatural ingredients in the Products. Reasonable consumers, like Plaintiffs, would consider the presence or risk of Glyphosate and artificial preservatives or unnatural ingredients in the Products a material fact when considering which bread products to purchase.

127. Defendant knew, yet failed to disclose, that it was not sufficiently or adequately monitoring or testing the finished Products or ingredients used in the Products for Glyphosate.

128. Defendant also knew but misleadingly claimed that the Products did not contain artificial preservatives or unnatural ingredients like manufactured citric acid.

129. The misrepresentations and partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions, were misleading due to Defendant's failure to sufficiently or adequately monitor or test for and disclose the presence (or material risk) of Glyphosate in the Products and Defendant's misleading claim the Products were free of artificial preservatives or unnatural ingredients.

130. Defendant knew or should have known that the Products contained or may contain levels of Glyphosate and artificial preservatives or unnatural ingredients that were not disclosed on the packaging.

131. Defendant knew or should have known that reasonable consumers, including Plaintiffs, expected Defendant to not only sufficiently monitor and test the finished Products and their ingredients for Glyphosate to ensure the quality of the Products, but to also disclose the

presence or risk of Glyphosate and artificial preservatives or unnatural ingredients like manufactured citric acid.

132. Further, Defendant knew or should have known that reasonable consumers paid higher prices, or paid any price at all, for the Products and expected Defendant to sufficiently test and monitor the Products for the presence of Glyphosate and refrain from using artificial preservatives or unnatural ingredients like manufactured citric acid.

133. The misrepresentations, partial misrepresentations, and omissions described herein are material and render the Products' packaging deceptive because without full disclosure, reasonable consumers, such as Plaintiffs, believe the Products do not contain containing artificial preservatives or unnatural ingredients or Glyphosate.

134. The misrepresentations, partial misrepresentations, and omissions described herein were intended to and did, in fact, cause consumers like Plaintiffs and the other Class Members to purchase products they would not have if the true quality and ingredients were disclosed or for which they would not have paid a premium price, or any price at all.

135. As a result of Defendant's deceptive, unfair, and misleading misrepresentations, partial misrepresentations, including the misrepresentations, partial misrepresentations, and omissions, and the overall impression created by the Products' packaging, Defendant was able to generate substantial sales, which allowed Defendant to reap enormous profits from Plaintiffs and similarly situated consumers who paid the purchase price or premium for the Products that were not as advertised.

136. Plaintiffs and other reasonable consumers would not have purchased the Products or would have paid less for them but for the misrepresentations, partial misrepresentations, and omissions described herein.

## CLASS ACTION ALLEGATIONS

137. Plaintiffs bring this action individually and on behalf of the following Classes, pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (3), and (c)(4):

> **Nationwide Class**: All individuals who purchased the Products within the relevant limitations periods in the United States for household use, and not for resale (the "Class").
>
> **Illinois Class**: All individuals who purchased the Products within the relevant limitations periods in Illinois for household use, and not for resale (the "Illinois Class").
>
> **New York Class:** All individuals who purchased the Products within the relevant limitations periods in New York for household use, and not for resale (the "New York Class," and together with the Illinois Whole Grains Class, the "State Classes").

138. Members of the Nationwide Class and State Classes are sometimes, where appropriate, referred to herein collectively as "Class Members" or the "Class(es)."

139. Excluded from the proposed Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest.

140. Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

141. The claims of all Class Members derive directly from a single course of conduct by Defendant. Defendant engaged and continues to engage in uniform and standardized conduct toward the proposed Class Members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual Class Members.

142. Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

143. **Numerosity:** The members of the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to the parties and Court.

144. **Ascertainability:** The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendant in the usual course of business and within their control or Plaintiffs and the Classes themselves. Plaintiffs anticipate providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

145. **Commonality and Predominance:** Common questions of law and fact exist as to all Class Members. These questions predominate over the questions affecting only individual Class Members. Questions of law and fact common to Plaintiffs and the Classes include, without limitation:

a. Whether the misrepresentations, partial misrepresentations, and omissions described herein were misleading;

b. Whether the misrepresentations, partial misrepresentations, and omissions described herein were unfair;

c. Whether the misrepresentations, partial misrepresentations, and omissions described herein were material to a reasonable consumer;

d. Whether Defendant had knowledge that the misrepresentations, partial misrepresentations, and omissions described herein were material, false, deceptive, and misleading;

e. Whether Defendant owed a duty to disclose;

f. Whether Defendant violated the laws of the States of Illinois and New York;

g. Whether Defendant knew or should have known the Products contained or risked containing Glyphosate;

h. Whether Defendant failed to disclose that the Products contained or risked containing Glyphosate;

i. Whether Defendant knew or should have known the Products contained artificial preservatives or unnatural ingredients such as manufactured citric acid;

j. Whether Defendant failed to disclose that the Products contained artificial preservatives or unnatural ingredients such as manufactured citric acid;

k. Whether Defendant had exclusive or superior knowledge of the omissions described herein;

l. Whether Plaintiffs could have reasonably discovered the omissions described herein;

m. Whether Defendant engaged in unfair trade practices;

n. Whether Defendant engaged in false advertising;

o. Whether Defendant committed fraudulent omissions;

p. Whether Defendant made fraudulent misrepresentations by omission;

q. Whether Plaintiffs and the Class Members are entitled to actual, statutory, and punitive damages; and

r. Whether Plaintiffs and the Class Members are entitled to declaratory and injunctive relief.

146. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all the Class Members. Identical

statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

147. **Typicality:** Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the Class Members sustained damages as a result of Defendant's uniform wrongful conduct during transactions with them. Plaintiffs and all Class Members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class Members.

148. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and there are no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Class Members.

149. **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The injuries suffered by each Class Member are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for the Class Members to obtain effective relief from Defendant. Even if Class Members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action

presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

150. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief:** This action may properly be maintained as a class action because:

a. the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant; and

b. the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

151. **Policies Generally Applicable to the Classes:** This case is appropriate for certification because Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect the Class Members uniformly, and Plaintiffs' challenge to those practices hinges on Defendant's conduct with respect to the Classes as a whole, not on individual facts or law applicable only to Plaintiffs.

## FIRST CAUSE OF ACTION

**Violation of Illinois's Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. § 505/1, *et seq.***
**(On Behalf of Plaintiff Szabla and the Illinois Class)**

152. Plaintiff Szabla incorporates by reference paragraphs 1-20 and 29-151 in this Complaint and restates them as if fully set forth herein.

153. Plaintiff Szabla and the Illinois Class members, and Defendant are "persons" within the meaning of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"). 815 ILCS 505/1(c).

154. Defendant engages in "trade" or "commerce" in Illinois as defined by 815 ILCS 505/1(f).

155. The Products are "merchandise." 815 Ill. Comp. Stat. § 505/1(b).

156. There was a sale of merchandise. 815 Ill. Comp. Stat. § 505/1(d).

157. ICFA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact[.]" 815 Ill. Comp. Stat. § 505/2.

158. Defendant's misrepresentations, partial misrepresentations, and omissions, concealment, and other deceptive conduct, including the misrepresentations, partial misrepresentations, omissions, active concealment, and other deceptive conduct as described herein constitute a violation of the ICFA.

159. Defendant engaged in deceptive acts or practices in violation of the ICFA by knowingly concealing, omitting, or failing to disclose the Products' true quality and suitability for consumption, including through the misrepresentations, partial misrepresentations, omissions, active concealment, and other deceptive conduct as described herein.

160. Defendant knew the Products did not have the quality or standards as described above because they contained artificial preservatives or unnatural ingredients or Glyphosate.

161. Defendant intended that Plaintiff Szabla and the Illinois Class would rely on the overall impression of the packaging, along with the misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct, including through the misrepresentations, partial misrepresentations, omissions, active concealment, and other deceptive conduct as described herein regarding the Products' quality and standards when deciding to purchase the Products, unaware of the undisclosed material facts.

162. Defendant's misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, occurred before Plaintiff Szabla and the Illinois Class decided to purchase the Products.

163. Plaintiff Szabla and the Illinois Class relied on, and were in fact deceived by, the overall impression of the packaging, along with the misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, with respect to the Products' quality and standards.

164. The facts misrepresented, concealed, and/or not disclosed by Defendant were material facts in that Plaintiff Szabla and the Illinois Class, and other reasonable consumers would have considered them in deciding whether to purchase the Products.

165. For example, a reasonable consumer, such as Plaintiff Szabla, would want to know that food items, such as the Products, that were advertised for "health nut[s]" and as "heart

healthy," included Glyphosate, a pesticide associated with negative health consequences, including negative cardiovascular effects.

166. Had Plaintiff Szabla and the Illinois Class known the Products contained artificial preservatives or unnatural ingredients, such as manufactured citric acid, or Glyphosate, they would not have purchased the Products or paid the premium price.

167. A significant portion of the general consuming public or of Defendant's targeted consumers, acting reasonably in the circumstances, could be misled or deceived by Defendant's misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct as described herein.

168. Defendant's misrepresentations, partial misrepresentations, and omissions and other deceptive acts or practices caused Plaintiff Szabla and the Illinois Class to suffer injury in the form of actual damages when they purchased the Products that were worth less than the price they paid and that they would not have purchased had they known the Products contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate.

169. As a direct and proximate result of Defendant's deceptive, misleading, unfair, and unconscionable practices as set forth above, Plaintiff Szabla and the Illinois Class are entitled to actual damages, compensatory damages, injunctive relief, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

170. Plaintiff Szabla is entitled to pursue a claim on behalf of the Illinois Class against Defendant for actual damages, punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs to remedy Defendant's violations of the ICFA pursuant to 815 ILCS 505/10a.

171. Plaintiff Szabla therefore seeks actual and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Elsom-Schroth and the New York Class)**

172. Plaintiff Elsom-Schroth incorporates by reference paragraphs 1-20 and 29-151 in this Complaint and restates them as if fully set forth herein.

173. New York General Business Law ("GBL") section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

174. Defendant conducts consumer-oriented business and trade in its advertising and sale of goods throughout New York within the meaning of GBL section 349.

175. Defendant violated GBL section 349 by deceptively and misleadingly misrepresenting and omitting that the Products contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein.

176. GBL section 349 applies to Plaintiff Elsom-Schroth and the New York Class because the State of New York has a strong interest in protecting its residents from false advertising and deceptive business practices by companies marketing consumer goods within the state.

177. Through Defendant's misrepresentations, partial misrepresentations, and omissions, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, it intentionally marketed that the Products were of a particular standard,

grade, or quality, and suitable for use when they in fact contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate.

178. Defendant's misrepresentations, partial misrepresentations, and omissions, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, were directed at the consumer public at-large as they repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

179. The facts misrepresented, concealed or not disclosed by Defendant were material in that Plaintiff Elsom-Schroth and the New York Class, and other reasonable consumers, would have considered them important in deciding whether to purchase the Products.

180. For example, a reasonable consumer, such as Plaintiff Elsom-Schroth, would want to know that food items, such as the Products, that were advertised for "health nut[s]" and as "heart healthy," included Glyphosate, a pesticide associated with negative health consequences, including negative cardiovascular effects.

181. Had Plaintiff Elsom-Schroth and the New York Class known the Products did not have the quality, ingredients, standards, and suitability for use as advertised by Defendant and contained (or had a material risk of containing) artificial preservatives or unnatural ingredients, such as manufactured citric acid, or Glyphosate, they would not have purchased the Products or paid a premium price.

182. Defendant charged, and Plaintiff Elsom-Schroth and the New York Class paid, a premium price for the Products despite the availability of comparable, lesser-priced bread products from other manufacturers.

183. Defendant alone possessed the information that was material to Plaintiff Elsom-Schroth and the New York Class and failed to disclose such material information to consumers.

184. Defendant engaged and continues to engage in deceptive conduct in violation of GBL section 349.

185. The misrepresentations, partial misrepresentations, and omissions, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, caused Plaintiff Elsom-Schroth and the New York Class to suffer injury in the form of actual damages when they purchased the Products that were worth less than the price paid and that they would not have purchased at all had they known the Products contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate.

186. Defendant intended for the Plaintiff Elsom-Schroth and the New York Class to rely on their misrepresentations, partial misrepresentations, and omissions, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the Products' quality, ingredients, standards, and suitability for use when purchasing the Products, unaware of the undisclosed material facts.

187. GBL section 349 applies to Plaintiff Elsom-Schroth and the New York Class because the State of New York has an interest in regulating business conduct in the region.

188. Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff Elsom-Schroth and the New York Class and will continue to damage both Plaintiff Elsom-Schroth and the New York Class and deceive the public unless enjoined by this Court.

189. As a direct and proximate result of these violations, Plaintiff Elsom-Schroth and the New York Class, and other reasonable consumers have been harmed, and that harm will

continue unless Defendant is enjoined from further omitting the true quality, ingredients, standards, and suitability for use of the Products.

190. Pursuant to GBL sections 349(h) and 350-e, Plaintiff Elsom-Schroth and the New York Class seek injunctive relief, declaratory relief, full refund, compensatory and punitive damages, actual damages or $50 (whichever is greater), statutory and treble damages, and attorneys' fees.

## THIRD CAUSE OF ACTION

**Violations of New York's False Advertising Law, N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Elsom-Schroth and the New York Class)**

191. Plaintiff Elsom-Schroth incorporates by reference paragraphs 1-20 and 29-151 in this Complaint and restates them as if fully set forth herein.

192. GBL section 350 prohibits false advertising in the conduct of any business, trade, or commerce.

193. Pursuant to GBL section 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect. … [considering] representations made by statement, word [or] design [and] the extent to which the advertising fails to reveal facts material in the light of such representations."

194. Defendant knew or should have known the Products did not have the quality, ingredients, standards, and suitability for use as described above because they contained (or had a material risk of containing) artificial preservatives or unnatural ingredients, such as citric acid, or Glyphosate.

195. Defendant purposely misrepresented, actively concealed, and did not disclose material facts regarding the artificial preservatives or unnatural ingredients or Glyphosate, to consumers, such as Plaintiff Elsom-Schroth and the New York Class.

196. The facts misrepresented, concealed or not disclosed by Defendant were material in that Plaintiff Elsom-Schroth and the New York Class, and other reasonable consumers, would have considered them important in deciding whether to purchase the Products.

197. For example, a reasonable consumer, such as Plaintiff Elsom-Schroth, would want to know that food items, such as the Products, that were advertised for "health nut[s]" and as "heart healthy," included Glyphosate, a pesticide associated with negative health consequences, including negative cardiovascular effects.

198. Had Plaintiff Elsom-Schroth and the New York Class known the Products did not have the quality, ingredients, standards, and suitability for use as advertised by Defendant and contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate, they would not have purchased the Products or paid a premium price.

199. Defendant charged, and Plaintiff Elsom-Schroth and the New York Class paid, a premium price for the Products despite the availability of comparable, lesser-priced bread products from other manufacturers.

200. Defendant's conduct caused Plaintiff Elsom-Schroth and the New York Class to suffer actual damages when they purchased the Products that were worth less than the price paid and that they would not have purchased at all had they known the Products contained (or had a material risk of containing) artificial preservatives or unnatural ingredients or Glyphosate.

201. As a direct and proximate result of Defendant's violation of GBL section 350, Plaintiff Elsom-Schroth and the New York Class have been injured, and that harm will continue unless Defendant is enjoined from further misrepresenting and omitting the true quality, ingredients, standards, and suitability of their Products, including but not limited to the presence of artificial preservatives or unnatural ingredients or Glyphosate.

202. Defendant's conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Defendant's advertising while unaware of the true nature of the Products, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein. Defendant's misrepresentation and omission of this material information deprived consumers of the ability to make informed purchasing decisions and created a false impression that the Products were healthy, nutritious, safe for consumption, and made without artificial preservatives or unnatural ingredients. This deception not only caused economic harm but undermined public trust in products that claim to be safe for everyday use.

203. Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

204. Pursuant to GBL section 350-e, Plaintiff Elsom-Schroth and the New York Class seek injunctive relief, declaratory relief, full refund, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Violations of Breach of Implied Warranty of Merchantability
### (on Behalf of Plaintiffs and the Classes)

205. Plaintiffs incorporate by reference paragraphs 1-20 and 29-151 in this Complaint and restate them as if fully set forth herein.

206. Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Classes.

207. There was a sale of goods from Defendant to Plaintiffs and the members of the Classes.

208. At all times herein, Defendant manufactured and sold the Products and, prior to the time the Products were purchased by Plaintiffs and the Class Members, impliedly warranted that

the Products were of merchantable quality and fit for their ordinary use (consumption with no health risks).

209. Plaintiffs and the Classes relied on these implied warranties when they purchased the Products.

210. The Products were not fit for their ordinary use (consumption without risk of health harm) as they were manufactured without proper quality control procedures and contained (or had a material risk of containing) Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid, which were not identified on the packaging.

211. These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Classes, and thus constituted implied warranties.

212. Defendant breached the implied warranties by selling the Products that contain (or risk containing) Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

213. Defendant was on notice of this breach as it were aware of the inclusion (or risk) of Glyphosate and/or artificial preservatives and unnatural ingredients such as manufactured citric acid.

214. Privity exists because Defendant impliedly warranted to Plaintiffs and the Class Members that the Products were healthy, nutritious, and safe for consumption and not containing artificial preservatives or unnatural ingredients and the Products were manufactured with proper quality control measures; however, Defendant failed to mention or disclose the Products were manufactured without proper quality control procedures and contained (or had a material risk of containing) Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

215. As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Classes suffered actual damages by: (1) paying a premium price for the Products that they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Glyphosate and/or artificial preservatives or unnatural ingredients such as manufactured citric acid; (2) purchasing the Products they would not have purchased had Defendant's omissions been disclosed; and/or (3) receiving the Products that were worthless because they were manufactured without proper quality control procedures and contains or risk containing Glyphosate and/or artificial preservatives or unnatural ingredients such as manufactured citric acid.

216. Plaintiffs, on behalf of themselves and the Classes, seek actual damages for Defendant's failure to deliver goods that conform to its implied warranties and resulting breach.

## FIFTH CAUSE OF ACTION

### Fraud by Omission
### (on Behalf of Plaintiffs and the Classes Based on State Law)

217. Plaintiffs incorporate by reference paragraphs 1-20 and 29-151 in this Complaint and restate them as if fully set forth herein.

218. Plaintiffs, the Class Members and Defendant acted within the context of a business transaction when Plaintiffs and the Class Members purchased the Products for household use and not for resale.

219. Plaintiffs and the Class Members were ordinary non-business consumers.

220. Defendant knew the Products contained or risked containing Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

221. Defendant knowingly concealed from and failed to disclose to Plaintiffs and the Class Members that the Products contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

222. Defendant knew or should have known the Products did not have the quality, ingredients or standards as described herein because they contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

223. As a manufacturer of staple food items like the Products, Defendant is in a special position of trust upon which consumers like Plaintiffs rely.

224. Defendant was under a duty to disclose the Products' true quality, ingredients, and standards because:

a. Defendant had exclusive knowledge that the Products contained or had a material risk of containing Glyphosate;

b. Defendant had exclusive knowledge that the Products contained artificial preservatives and unnatural ingredients such as manufactured citric acid; and

c. Defendant also had exclusive knowledge related to the manufacturing of the Products, including information related to quality control and its suppliers;

d. Defendant was aware it had superior knowledge regarding information not readily available to Plaintiffs and the Class Members that the Products did not have the quality and standards as advertised and that they contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid, without Defendant disclosing such information on the Products' packaging; and

e. Defendant was in a superior position to know the true facts about Products' quality, ingredients, and standards and to know that, in fact, they contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

225. Defendant failed to discharge its duty to disclose the presence of Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid in the Products.

226. Defendant actively concealed or failed to disclose facts about the Products' quality, ingredients, and standards and intended that Plaintiffs and the Class Members would rely on its omissions, concealment, and other deceptive conduct regarding the Products' quality, ingredients and standards when purchasing the Products, unaware of the undisclosed material facts.

227. Defendant's omissions, concealment, and other deceptive conduct were made to deceive reasonable consumers about the Products' quality and standards. Plaintiffs and the Class Members relied on, and were in fact deceived by, Defendant's omissions, concealment, and other deceptive conduct with respect to the Products' quality, ingredients and standards.

228. Defendant knows its customers trust the quality of the Products and that they expect the Products to be free of Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid. Defendant intentionally and knowingly positioned itself in the market as manufacturers of premium bread products made of superior ingredients for which consumers will pay a premium.

229. The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs, the Class Members, and other reasonable consumers would have considered them when deciding whether to purchase the Products. Had Plaintiffs and the Class Members known the Products did not have the quality, ingredients and standards as advertised by Defendant and

Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid, they would not have purchased the Products or paid a premium price.

230. Defendant knowingly concealed that the Products contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid, with the intent to defraud and deceive the Plaintiffs and Class Members.

231. As a direct and proximate result of Defendant's omissions, concealment, and other deceptive conduct, Plaintiffs and the Class Members suffered actual damages in that they purchased the Products that were worth less than the price they paid and that they would not have purchased at all had they known the Products contained Glyphosate and artificial preservatives or unnatural ingredients such as manufactured citric acid.

232. On behalf of themselves and other members of the Classes, Plaintiffs seek actual damages, injunctive, and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SIXTH CAUSE OF ACTION

**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

233. Plaintiffs incorporate by reference paragraphs 1-20 and 29-151 in this Complaint and restate them as if fully set forth herein.

234. Plaintiffs and the Classes conferred substantial benefits on Defendant through their purchases of the Products.

235. Defendant accepted and retained these payments, even though it misrepresented the quality and characteristics of the Products. Defendant's retention of this benefit is unjust because it knowingly marketed and sold Products containing undisclosed Glyphosate and artificial preservatives and unnatural ingredients such as manufactured citric acid, while expressly

representing the Products as healthy, nutritious, safe for consumption, and not containing artificial preservatives or unnatural ingredients, and Defendant's representations were made in violation of the law.

236. Defendant either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Products would not contain Glyphosate and/or artificial preservatives and unnatural ingredients such as manufactured citric acid. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

237. Defendant was obligated to disclose the Products contained (or had a material risk of containing) Glyphosate and/or artificial preservatives and unnatural ingredients such as manufactured citric acid, because:

a. Defendant had exclusive knowledge that the Products contained (or had a material risk of containing) Glyphosate;

b. Defendant had exclusive knowledge that the Products contained artificial preservatives and unnatural ingredients such as manufactured citric acid; and

c. Defendant actively concealed the presence of Glyphosate and/or artificial preservatives and unnatural ingredients such as manufactured citric acid, in the Products from Plaintiffs and the Classes.

238. Defendant's acceptance and retention of these benefits of the payments from Plaintiffs and the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Classes.

239. It would be unfair for Defendant to keep the money spent without compensating Plaintiffs and the Classes because Defendant misled consumers into believing the Products were

healthy and nutritious and made without artificial preservatives or unnatural ingredients, when in fact they were not.

240. Plaintiffs and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

241. Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, statutory damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, prays for relief and judgment against Defendant as follows:

A. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and Class members compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C. Awarding Plaintiffs and the Class members appropriate relief, including actual and statutory damages;

D. Awarding Plaintiffs and the Class members exemplary and punitive damages;

E. Granting Plaintiffs and the Class members declaratory and equitable relief, including restitution and disgorgement;

F. Enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

G. Awarding Plaintiffs and the Class members the costs of prosecuting this action, including expert witness fees;

H. Awarding Plaintiffs and the Class members reasonable attorneys' fees and costs as allowable by law;

I. Awarding pre-judgment and post-judgment interest; and

J. Granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 24, 2026

Respectfully submitted,

By: */s/ Kara A. Elgersma*
Kara A. Elgersma
Margaret Shadid
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker, Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kae@wbe-llp.com
ms@wbe-llp.com

Raphael Janove (Ill. Bar No. 6328523)
**JANOVE PLLC**
115 Broadway, 5th Floor
New York, NY 10006
Telephone: (646) 347-3940
raphael@janove.law

Rebecca A. Peterson
Krista K. Freier
Catherine A. Peterson
**HECHT PARTNERS LLP**
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612) 778-9595
rpeterson@hechtpartners.com
kfreier@hechtpartners.com
cpeterson@hechtpartners.com
eservicecapg@hechtpartners.com

Kelly L. Tucker
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
ktucker@gelaw.com

Jennifer Sarnelli (*pro hac vice* forthcoming)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jsarnelli@gelaw.com

***Counsel for Plaintiffs and the Proposed Classes***